UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.

D-1 RAJENDRA BOTHRA,
D-2 ERIC BACKOS,
D-3 GANIU EDU,
D-4 DAVID LEWIS,
D-5 CHRISTOPHER RUSSO,
D-6 RONALD KUFNER,

       Defendants.
_____/

Case No. 2:18-cr-20800

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER
GRANTING IN PART AND DENYING IN
PART MOTION TO EXCLUDE EXPERT TESTIMONY [264]**

Defendants were six physicians licensed to practice medicine in Michigan. ECF 1, PgID 6–8. Each Defendant was named in a 56-count indictment the Court ordered unsealed in late 2018. *See generally* ECF 1; 9. Defendants were charged with health care fraud conspiracy under 18 U.S.C. § 1349; aiding and abetting health care fraud under 18 U.S.C. §§ 1347 and 2; conspiracy to distribute and possess with intent to distribute controlled substances under 21 U.S.C. §§ 841(a)(1) and 846; and aiding and abetting the unlawful distribution of controlled substances under 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. *See generally* ECF 1. Two Defendants have pleaded guilty, ECF 301; 364, but the remaining four Defendants are scheduled for trial on May 17, 2022, ECF 329, PgID 2405.

1

One Defendant, Dr. David Lewis, moved to exclude the testimony of a Government expert. ECF 264. The other Defendants filed notices of joinder and concurrence in Dr. Lewis's motion. ECF 265; 267; 268; 269; 270. The Court questioned the parties about the motion during a hearing in December 2021.[1] After further review of the parties' briefing and additional research, the Court will grant in part and deny in part the motion.

### BACKGROUND

Lead Defendant Dr. Rajendra Bothra owned and operated two professional limited liability companies—The Pain Center and The Interventional Pain Center—located in Southeast Michigan. ECF 1, PgID 6. The two facilities were participating providers with Medicare and Medicaid and would submit claims for reimbursement to the federal programs. *Id.* Dr. Bothra and the other Defendants—Dr. Eric Backos, Dr. Ganiu Edu, Dr. Lewis, Dr. Christopher Russo, and Dr. Ronald Kufner—were licensed physicians in Michigan and enrolled as participating providers with Medicare at the two companies. *Id.* at 6–8. All six Defendants were also licensed by the Drug Enforcement Administration to prescribe controlled substances. *Id.*

The Government proffered an expert witness, Dr. Neel Mehta, to prove that some Medicare claims submitted by Defendants were illegitimate and some

---

[1] After questioning the parties about the motion at the hearing, the Court determined that a *Daubert* hearing was unnecessary. *See Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000) ("The district court is not obligated to hold a *Daubert* hearing.").

2

prescriptions that they issued were not legally sanctioned. ECF 367, PgID 2799.[2] Dr. Mehta received his medical doctorate degree from Tufts University before he completed an internship in Internal Medicine at Carney Hospital in Massachusetts as well as both a residency in Anesthesiology and a fellowship in Pain Management at the New York-Presbyterian Hospital. *Id.* For more than a decade he has been board certified in both Anesthesiology and Pain Management. *Id.* Dr. Mehta later joined Weill Cornell Medical University where he currently serves on the faculty and holds the rank of Associate Professor of Anesthesiology. *Id.* Besides his professorship, Dr. Mehta is the Division Chief of Pain Medicine in Cornell Medicine's Anesthesiology Department and the Medical Director of Pain Medicine at New York Hospital-Weill Cornell Medical Center. *Id.* After analyzing evidence in the case, Dr. Mehta wrote a report concluding that Defendants engaged in illegitimate billing practices and prescribed controlled substances in a manner that was not legally sanctioned. *See generally* ECF 367.

Dr. Mehta reviewed the medical records of nine patients and some other evidence like patient interviews and undercover recordings related to the care of some of those patients. *Id.* at 2802. Dr. Mehta noted that some patients were seen by only one Defendant while others were seen by more than one. *Id.* at 2811–2830. For each

---

[2] During review of Dr. Mehta's expert report—attached to the motion as exhibit B, ECF 264-2—the Court noticed that some patient names were unredacted. The Court's chambers asked Dr. Lewis to submit a fully redacted version of the report in a separate filing on the docket. Dr. Lewis did so, and the fully redacted version is now on the docket as ECF 367. The Court will order the Clerk of the Court to strike the version that is not fully redacted to protect the privacy of the patients whose names were accidentally left unredacted.

3

patient, Dr. Mehta described how the information he reviewed demonstrated that the Defendants who treated the patient violated the law and which count of the indictment the violation constituted. *Id.*

At a high level of generality, Dr. Mehta painted the picture of a well thought out and planned scheme in which:

- Defendants would have patients in for monthly appointments during which Defendants would perform cursory examinations or no examinations at all. *Id.* at 2819, 2823–24, 2829. Sometimes Defendants would even use a pre-filled out checklist rather than write detailed notes about a patient exam. *Id.* at 2814–15.

- Defendants would prescribe opioid-controlled substances to the patients. *See generally id.* at 2811–2830.

- When urine drug tests came back with inconsistent results for the prescribed opioids at later appointments, Defendants would continue to write the prescriptions rather than confront patients about the inconsistencies. *Id.* at 2812, 2816–17, 2819, 2822, 2825, 2827, 2829.

- Defendants would suggest injections, testing, or medical equipment that was not medically necessary, and occasionally painful and harmful, and then file Medicare claims for the unnecessary procedures, testing, or equipment. *Id.* at 2816–18, 2822, 2824–25, 2827–29.

- Some patients believed that if they did not consent to the unnecessary and occasionally harmful injections, testing, or medical equipment, the

4

doctors would discontinue the opioid prescriptions and discharge the patients. *Id.* at 2818, 2824–26, 2829. Sometimes a Defendant would make the quid pro quo nature of the transaction explicit to the patient, *id.* at 2818, 2825–26, and other times the quid pro quo nature was simply understood by a particular patient, *id.* at 2824, 2829.

- The quid pro quo transactional nature of the prescriptions, the continued prescriptions despite inconsistent urine drug test results without explanation, and the lack of documentation concerning non-opioid measures to treat patients made the prescriptions unlawful. *See generally id.* at 2811–2830.
- The lack of compliant documentation of the benefits of various procedures, tests, and medical equipment and lack of evidence of previous, more conservative courses of treatment made many claims for the procedures, tests, and equipment illegitimate. *See generally id.* at 2811–2830.

Dr. Mehta is expected to testify at trial and his testimony will be critical because the testimony appears to allow the Government to explain to the jury how the injections, testing, and medical equipment were unnecessary and how Defendants' opioid prescriptions were not sanctioned by the law. The testimony would also connect the dots between the illegitimate claims and the illegal prescriptions to show a coherent, fraudulent scheme that endangered the public.

5

Dr. Lewis challenged the admissibility of Dr. Mehta's testimony on four grounds. First, that Dr. Mehta used a medical malpractice standard rather than the criminal liability standard applicable to prosecutions of medical professionals under 21 U.S.C. § 841(a)(1). ECF 264, PgID 1759–68. According to Dr. Lewis, all legal conclusions drawn by Dr. Mehta were improper, and if he were allowed to testify before the jury, he would actually instruct the jurors on the wrong legal standard for conviction. *Id.* Second, that Dr. Mehta's report implies his testimony would violate Federal Rule of Evidence 704(b). *Id.* at 1769–70. Third, that Dr. Mehta's testimony would violate Federal Rule of Evidence 702 because he did not use a medical standard to formulate his report. *Id.* at 1771–73. And fourth, that Dr. Mehta's testimony is unreliable and would violate Federal Rule of Evidence 702 because he did not review complete patient charts. *Id.* 1773–77.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may" provide expert testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Courts must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v.*

6

*Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993). Courts consider four primary factors in the preliminary assessment: whether the theory or technique has been tested or is falsifiable, peer review of the theory or technique, the known or potential error rate of the theory or technique, and the theory or technique's general acceptance in the relevant expert community. *Id.* at 593–94. During the preliminary inquiry, courts also look to whether "the studies upon which the experts relied were not sufficient, whether individually or in combination, to support their conclusions." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146–47 (1997). If an expert's testimony "is connected to existing data only by the ipse dixit of the expert" or "there is simply too great an analytical gap between the data and the opinion proffered," courts may exclude the testimony. *Id.* at 146. The preliminary assessment is intended to make courts act as gatekeepers that ensure the reliability and relevance of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

If an expert's proffered testimony passes a court's gatekeeper preliminary assessment as both relevant and reliable, the expert is still prohibited, in criminal cases, from stating "an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b). While other testimony related to ultimate factual issues is not objectionable, Fed. R. Evid. 704(a), legal conclusions in the guise of expert opinions are strictly prohibited, *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994). Instruction of the jury on the law is the role of a court; there is too great a risk that legal conclusions in the guise of expert opinions would irreparably

7

taint later instructions. *Torres v. Cnty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985) (citations omitted). The Sixth Circuit has "excluded expert testimony for stating a 'legal conclusion' *only* when the witness explicitly testifies, in 'specialized' legal terminology, that a defendant violated (or did not violate) the law." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 317 (6th Cir. 2019) (emphasis added) (collecting cases). Specialized legal terminology will have a "separate, distinct . . . meaning in the law different from that present in the vernacular." *Torres*, 758 F.2d at 151.

## DISCUSSION

The Court will address each of Dr. Lewis's arguments in turn. Because the motion succeeds on the second theory but fails on the other three theories, the Court will grant in part and deny in part the motion.

I.  The Propriety of the Standard Employed by Dr. Mehta

Dr. Lewis first asserted that Dr. Mehta used a medical malpractice standard rather than the criminal liability standard applicable to prosecutions of medical professionals under 21 U.S.C. § 841(a)(1). ECF 264, PgID 1759–68. Per Dr. Lewis, all legal conclusions drawn by Dr. Mehta were improper and if he were allowed to testify before the jury, he would instruct them on the wrong legal standard for conviction. *Id.*

Dr. Mehta's report had a general standards section but also contained a short statement of how each Defendant failed to meet opioid prescription standards for certain patients. The general standards section stated:

8

> References in this report to activity or conduct being "outside the course of professional medical practice" or "outside the standard of care" is activity or conduct that does not comport with any accepted standard of medical care in the United States. If the activity or conduct at issue involves issuance of a prescription "outside the course of professional medical practice" or "outside the standard of care," or "not in good faith" it means that the prescription was issued without any legitimate medical reason or would not have been issued by a doctor acting in accordance with the standards of practice generally accepted in the United States.

ECF 367, PgID 2800. At the end of several sections that discussed his review of specific patient records, Dr. Mehta stated that the patient prescriptions were either "outside the course of professional medical practice and not issued in good faith" or a grammatically different but substantively identical formulation. *Id.* at 2816–17, 2824, 2829–30. In one instance, the report replaced the phrase "professional medical practice" with "standard professional practice." *Id.* at 2818. In another instance, the report used the phrase "outside the standard of usual medical practice." *Id.* at 2826.

For the portions of Dr. Mehta's report related to the health care fraud charges against Defendants, the standards typically used were "medically unnecessary," "not medically necessary," "unnecessary," or "not commensurate with Medicare requirements." *Id.* at 2816–18, 2827–29.

Now, before turning to Dr. Lewis's medical malpractice conflation argument, the Court must first determine whether the language used by Dr. Mehta constituted prohibited legal conclusions. *See Babb*, 942 F.3d at 317. The Court will address all the language used by Dr. Mehta except for the "good faith" language that is analyzed separately below.

9

First, "medically unnecessary," "not medically necessary," "unnecessary," and "not commensurate with Medicare requirements" are not legal conclusions because they are not specialized legal terminologies. *E.g.*, ECF 367, PgID 2816–18, 2827–29. None of the phrases have a specialized legal meaning distinct from how they are commonly understood both in the medical community and in public discourse. Dr. Mehta may therefore testify about whether procedures, tests, and medical devices were "medically unnecessary," "not medically necessary," "unnecessary," or "not commensurate with Medicare requirements." *E.g.*, ECF 367, PgID 2816–17, 2827–29. *See Babb*, 942 F.3d at 317; *Torres*, 758 F.2d at 151; *see also United States v. Volkman*, 797 F.3d 377, 389–90 (6th Cir. 2015) (citations omitted).

Second, the phrases "outside the course of professional medical practice," "outside the standard professional practice," "outside the standard of care," "without any legitimate medical reason," and "outside the standards of practice generally accepted in the United States" are not legal conclusions. *E.g.*, ECF 367, PgID 2816–17, 2824, 2829–30. The Sixth Circuit, in a similar case, held that an expert's testimony that prescriptions were "not for any legitimate medical purpose" and were outside "the scope of legitimate medical practice" was proper and did not constitute a legal conclusion. *Volkman*, 797 F.3d at 388–89. In reaching that holding, the Sixth Circuit approvingly cited a Seventh Circuit case that found an expert's testimony that prescriptions were "not consistent with the usual course of medical practice" and not "for a legitimate medical purpose" was proper and did not constitute a legal conclusion. *Id.* at 389 (citing *United States v. Chube II*, 538 F.3d 693, 698 (7th Cir.

10

2008)). At bottom, "the legal understanding of the phrase 'legitimate medical purpose' does not carry with it a 'separate, distinct and specialized meaning' from its medical counterpart; instead, one elucidates the other." *Id.* at 389–90 (citations omitted).

Here, the phrases "outside the course of professional medical practice," "outside the standard professional practice," "outside the standard of care," "without any legitimate medical reason," and "outside the standards of practice generally accepted in the United States" are also not legal terms of art with meanings distinct from their medical counterparts. *E.g.*, ECF 367, PgID 2816–17, 2824, 2829–30. Simply put, the legal question of whether the prescriptions were legitimate "is hardly answered in isolation" because "the 'lay' or, as we have previously described it, 'vernacular' understanding[s] of the phrase[s]—i.e., the phrase[s] as used in medical parlance—naturally inform[] the legal question." *Volkman*, 797 F.3d at 389 (citation omitted). The phrases are not legal conclusions, and Dr. Mehta can offer his opinion on them at trial.

Still, Dr. Lewis argued that Dr. Mehta's testimony is inappropriate because the standards he stated at the beginning of his report conflate the medical malpractice standard with the criminal liability standard applicable to prosecutions of medical professionals under 21 U.S.C. § 841(a)(1). ECF 264, PgID 1763–68. Dr. Lewis argued that the following sentence equates five different standards with one another:

> If the activity or conduct at issue involves issuance of a prescription 'outside the course of professional medical practice' or 'outside the standard of care,' or 'not in good faith' it means that the prescription was issued without any legitimate medical reason or would not have been

11

issued by a doctor acting in accordance with the standards of practice generally accepted in the United States.

*Id.* at 1764–65; *e.g.*, ECF 367, PgID 2800.

Dr. Lewis identified two problems with Dr. Mehta making the five phrases out to mean the same thing. First, whether prescriptions were outside the course of professional medical practice and illegitimate is a separate inquiry than whether the prescriptions were made in good faith. ECF 264, PgID 1765. And second, the phrase "outside the standards of practice generally accepted in the United States" is a medical malpractice standard rather than the standard for criminal liability. *Id.* at 1765–68. As Dr. Lewis reasoned, testimony equating the medical malpractice standard with the standard for criminal liability could lead the jury to convict him under the less stringent civil malpractice standard. *Id.* at 1765.

The actual standard for criminal liability under the statute, as reflected in jury instructions approved by the Sixth Circuit in *Volkman*, is that a prescription was "not for a legitimate medical purpose in the usual course of professional practice." *Volkman*, 797 F.3d at 388. The Sixth Circuit upheld a specific instruction that stated that a "doctor must treat you in a manner that meets the applicable standard of care that physicians of similar training would have given to you under the same circumstances" and that if the doctor fails to do so, then the doctor may be found *negligent*, but that is not the standard in a criminal case. *Id.* at 387–88. The approved instruction then reiterated that the criminal standard required the prescriptions to be "not for a legitimate medical purpose in the usual course of professional practice." *Id.* The Sixth Circuit has similarly approved the formulation "outside of ordinary

12

professional medical practice and without a legitimate medical purpose." *United States v. Godofsky*, 943 F.3d 1011, 1026 (6th Cir. 2019).

Admittedly, the standard at the beginning of Dr. Mehta's report is inarticulately worded and equates the five separate phrases. But the portions of the report in which Dr. Mehta draws conclusions about the treatment of certain patients do not equate the five phrases. In those portions of the report, Dr. Mehta distinctly separates "outside the course of professional medical practice" or an equivalent phrase from "not issued in good faith." ECF 367, PgID 2816–18, 2824, 2826, 2829–30. The conclusions therefore do not plainly conflate the multiple standards used in the report. But defense counsel may question Dr. Mehta at trial about whether he conflated the standards throughout his report.

Similarly, the conclusions state that the prescriptions were either "outside the course of professional medical practice," "outside professional medical practice," or "outside the standard of usual medical practice." *Id.* at 2816–18, 2824, 2826, 2829–30. The phrases closely align with the jury instructions the Sixth Circuit approved in *Volkman* and the formulation in *Godofsky*; they do not include a general standard of care that would impermissibly refer to the civil medical malpractice standard. *See Godofsky*, 943 F.3d at 1026; *Volkman*, 797 F.3d at 387–88. The Court will therefore not exclude Dr. Mehta from testifying about his opinion as to whether Defendants' actions were outside the standards. Again, defense counsel may cross-examine Dr. Mehta at trial about whether he conflated the standards with the medical malpractice standard to reach his conclusions.

13

Last, the phrase "outside the standard of care" in the report's introductory paragraph may refer to the civil medical malpractice standard. *See* ECF 367, PgID 2800. The phrase "in accordance with the standards of practice generally accepted in the United States" may also refer to the medical malpractice standard. *See id.* That said, defense counsel may elicit testimony on the precise meaning of the phrases and whether all other standards in the report have the same meaning to Dr. Mehta.[3]

II.    Testimony about Good Faith

Dr. Lewis next challenged Dr. Mehta's testimony about whether prescriptions were made in "good faith" and argued that the testimony is impermissible because good faith is a mental state and therefore an ultimate issue that an expert is barred from discussing. ECF 264, PgID 1769–70. The good faith standard is "more or less *objective* good faith: whether a reasonable doctor under the circumstances could have believed, albeit mistakenly, that he had acted within the scope of ordinary professional medical practice for a legitimate medical purpose." *Godofsky*, 943 F.3d at 1026 (emphasis in original). In particular, if a jury finds that Dr. Lewis offered prescriptions "outside of ordinary professional medical practice and without a legitimate medical purpose" but that Dr. Lewis "did so with a reasonable belief (i.e.,

---

[3] While the Government correctly points out that the language was borrowed from a jury instruction approved by the Supreme Court in 1975, *see United States v. Moore*, 423 U.S. 122, 138–39; ECF 271, PgID 1839–40, the *Volkman* instruction and *Godofsky* formulation more accurately describe the difference between the current understandings of the medical malpractice standard of care and the criminal liability standard under 21 U.S.C. § 841(a)(1). *See also United States v. Seelig*, 622 F.2d 207, 212–13 (6th Cir. 1980) ("Implicit in *Moore* is that registered doctors (or other practitioners) are exempt from criminal liability under § 841(a)(1) unless they were acting outside the usual course of professional practice.").

14

in good faith) that he was acting within the scope of ordinary professional medical practice or for a legitimate medical purpose, then he did not do so knowingly or intentionally." *Id.* at 1026. Based on the language in *Godoflsky*, good faith is a defense to whether the conduct was knowing or intentional, and therefore a defense to the mental state element of the offense. *Id.* at 1021, 1026. As a result, Rule 704(b) prohibits Dr. Mehta from offering an opinion on whether Defendants acted in good faith.

Regardless, the objective good faith standard formulated in *Godofsky* is exactly the type of term that has a legal meaning distinct from the vernacular meaning which transforms expert testimony about the term into legally conclusory testimony. *See Babb*, 942 F.3d at 317; *Torres*, 758 F.2d at 151; *see also Volkman*, 797 F.3d at 389–90 (citations omitted). At trial, Dr. Mehta may testify about whether an ordinary doctor who treated a patient at issue in his report could not have reasonably believed that the course of treatment taken was compliant with the law. But Dr. Mehta may not testify that Defendants' prescriptions were not in good faith or were in bad faith.

III.     Medical Standards Employed by Dr. Mehta

Dr. Lewis next argued that the Court should exclude Dr. Mehta's testimony because his opinions were not derived "from objective standards adopted in the medical community." ECF 264, PgID 1772. But in a section of the report titled "Medical Standards Used to Establish Opinions," Dr. Mehta specifically stated that he relied on: (1) Centers for Disease Control Guideline Prescribing Opioids for Chronic Pain, March 2016; (2) Michigan Guidelines for the Use of Controlled

15

Substances for the Treatment of Pain; and (3) 2009 Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain issued by the American Pain Society and the American Academy of Pain Medicine. ECF 367, PgID 2803–04. Dr. Mehta then quoted portions of the three sources he used to support his opinions. *Id.* Dr. Mehta also referenced the American Society of Interventional Pain Physicians 2012 Guide for Responsible Opioid Prescribing in Non-Cancer Pain. *Id.* at 2803.

The three sources cited in the Medical Standards section sufficiently show that Dr. Mehta did not merely use personal standards to form his opinions. In fact, the three sources, which Dr. Lewis failed to discuss in his motion, *see* ECF 264, suggest that Dr. Mehta's opinions are reliable under Federal Rule of Evidence 702 because the sources detail the medical community standards governing prescriptions for pain medication. *See* ECF 367, PgID 2803–04. If Dr. Lewis believes the three sources are insufficient or seeks a deeper explanation for the source that supports each specific portion of Dr. Mehta's report, then he may use his cross-examination of Dr. Mehta to do just that. But Dr. Mehta's general reliance on the sources, combined with quotations from the portions he relies upon heavily, prevents the Court, as gatekeeper, from entirely excluding his testimony.[4]

---

[4] Dr. Mehta also stated, "[a] bibliography at the end of this report lists specific documents, guidelines, and resources that support my opinion." ECF 367, PgID 2803. The copy of the report submitted as an exhibit to the motion by Dr. Lewis did not contain the bibliography. *See generally id.*

16

IV.     Completeness of Records Reviewed by Dr. Mehta

Last, Dr. Lewis challenged Dr. Mehta's report because he believes that Dr. Mehta did not review complete records for the patients whose treatment he analyzed. ECF 264, PgID 1773–77. Dr. Lewis stated that Dr. Mehta's opinions about the nine patients whose care he analyzed in his report were based on one-hundred thirty-four patient files. *Id.* at 1775. But according to Dr. Lewis, the files were incomplete since he had recorded treatment notes on electronic health record platforms that were missing. *Id.* at 1775–76.

If true, the reliability of Dr. Mehta's opinions about the nine patients would be called into question. But Dr. Lewis did not cite specific patient records with the treatment notes. *See generally* ECF 264. He instead claimed that the Government did not provide the electronic versions of the records with the treatment notes in an accessible format. *Id.* at 1778. And Dr. Lewis did not provide information from his personal experience treating any of the patients analyzed in the report about his recollection of the specific contents of the notes and how they undermine Dr. Mehta's opinions. *See generally* ECF 264. Without specific evidence showing that the nine patient records Dr. Mehta reviewed were incomplete and that his opinions were undermined by additional notes, the challenge to Dr. Mehta's testimony fails.

By the time of trial, Dr. Lewis will have had the opportunity to review all evidence to find any notes for the nine patients that were not in the records reviewed by Dr. Mehta. And if Dr. Lewis finds any such notes, his counsel can conduct a strong cross-examination of Dr. Mehta. But without evidence to support his assertion that

17

other notes that undermine Dr. Mehta's opinions supplement the records of the nine patients analyzed in the report, Dr. Lewis has not shown that Dr. Mehta's report is unreliable. In all, based on the filings, Dr. Mehta relied on sufficient facts and data to support his opinions under Federal Rule of Evidence 702.

## CONCLUSION

Dr. Mehta may testify at trial about all his conclusions except the conclusions in his report concerning whether Defendants acted in good faith. Dr. Lewis and the other Defendants may cross-examine Dr. Mehta about the other issues raised in the motion as the Court set forth above.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that the motion to exclude expert testimony [264] is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that the Clerk of the Court must **STRIKE** ECF 264-2 from the docket. ECF 367, the fully redacted version of ECF 264-2, is Exhibit B to ECF 264.

**SO ORDERED.**

s/ Stephen J. Murphy, III<br>STEPHEN J. MURPHY, III<br>United States District Judge

Dated: April 26, 2022

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 26, 2022, by electronic and/or ordinary mail.

s/ David P. Parker<br>Case Manager

18