UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                              Case No. 18-cr-20800
                                  Hon. Stephen J. Murphy

D-2 DR. ERIC BACKOS,

        Defendant.
_____/

**DEFENDANT'S SENTENCING MEMORANDUM**

Fashioning a sentence in keeping with the litany of proper purposes set forth in 18 U.S.C. § 3553(a), and consistent with its direction that the Court "impose a sentence sufficient, but not greater than necessary, to comply with" those purposes has been described as "a holistic endeavor." *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015). This description seems altogether apt, in light of the way in which a fair and just sentence should take into account the defendant's life as a whole, and not merely what he or she has done wrong. Lives, and the people who live them, are, after all, three-dimensional, and any judgment about a person and his or her life - or about the appropriate consequences of their wrongdoing - should incorporate that understanding.

There are no Guidelines disputes in this case, but the writer contends that, in fashioning a fair and just sentence, they offer only limited guidance, and that due consideration of Dr. Backos's life history, current circumstances, and cooperation, militates in favor of a noncustodial sentence, which would both recognize the positive aspects of that life and history, and work substantial justice under the circumstances of this case.

In addition, the writer has been authorized by counsel for the government to inform the Court that the government will be filing a Motion for a Downward Departure pursuant to U.S.S.G. 5K1.1 recommending a non-custodial sentence of 24 months probation.

**Statutory sentencing factors.**

<u>The history and characteristics of the defendant and the nature and circumstances of the offense</u>

To a great degree, of course, the considerations identified in 18 U.S.C. §3553(a) are interlinked. Thus, for example, explication of "the history and characteristics of the defendant" is a necessary precondition to understanding "the nature and circumstances of the offense," and, of course the defendant's "history and characteristics" also inform the factors that follow - such as the "need" for any particular sentence or kind of sentence in a particular case, and whether the

2

imposition of sentence outside the mine run constitutes a reasonable response to the particular facts of the case, or is an example of "unwarranted sentence disparities."

While acknowledging that such judgments are uniquely within the Court's purview, in the writer's view, collectively analyzed, the factors outlined in § 3553(a), including "talionic"[1] considerations, such as the need for a sentence to "reflect the seriousness of the offense, . . .promote respect for the law, and . . .provide just punishment for the offense," would be in line with a "holistic" evaluation of Dr. Backos's life and works.

**Offense Conduct**

While the nature of the offense behavior to which Dr. Backos has pled guilty is of course troubling, the fact of the matter is that, while Dr. Backos worked at the Pain Center until it was shut down in 2018,[2] his Rule 11 Plea Agreement establishes that his involvement in unlawful activities was far more limited than that: specifically, it provides that "[t]he parties stipulate that Dr. Backos was a member of the conspiracy from on or about January 2013 through on or about December 2014." R.

---

[1] From "Lex talionis," or the law of the talion. "The book of Exodus prescribes the Lex talionis, 'An eye for an eye, a tooth for a tooth.' Exodus 21:22-23." *Payne v. Tennessee,* 501 U.S. 808, 819 (1991). Such concepts essentially echo the traditional notion of "retribution."

[2] According to his Rule 11 Plea Agreement, Dr. Kufner was employed there from May, 2014 to October, 2017. R. E. 301, Plea Agreement, Page ID # 2211.

3

E. 364, Plea Agreement, Page ID # 2706. As Dr. Backos explained to the Probation Department: "In 2014, LARA issued a complaint with an allegation that I was prescribing opioids outside the course of legitimate medical practice. I attended a compliance conference with Dr. Tocco-Bradley and an Assistant Attorney General and my prescribing practice of opioids was one of the topics we discussed. After attending the compliance conference, I not only altered my prescribing practices but also refused to refer people for unnecessary injections despite being pressured to do so." Presentence Investigation Report, ¶ 57.

Moreover, Dr. Backos in an effort to make up for his misdeeds, agreed to cooperate. In his debriefings, which totaled in excess of 10 hours, Dr. Backos admitted his involvement in the offense and detailed the involvement of his co-conspirators. Dr. Backos also testified at the trial of his co-conspirators and according to the Government, he testified truthfully.

**History and characteristics of the defendant**

Dr. Backos's relatively short lived involvement in the conspiracy, as the attached letters from his patients[3] demonstrate, does not really define him or his professional life, which has, as those letters attest, been characterized by the highest

---

[3]These letters, as well as the other letters referred to hereinafter, are contained in Exhibit One, attached, in the order to which they are referred.

degree of caring professionalism. His daughter, Melanie Backos Nwanko, who is employed as a registered nurse at the University of Michigan Mott Childrens Hospital, worked at times worked the Bothra Clinic during the summer describes how the patients and staff found her father to be a compassionate and caring doctor:

> During the summers of highschool and college, I would sometimes help out at The Pain Center. It was always very special and touching to hear stories from his patients and coworkers. They would often praise him as an incredibly knowledgeable and compassionate Physician. Everyone loved his sense of humor and how at ease he made them feel. One of his most loved qualities was his ability to listen to their concerns and treat his patients as family. He took time to get to know his patients as individuals. During holidays, he would often come home with baklava, food trays, and various goodies gifted by grateful patients. When I was pregnant with my first born, my Dad's first grandchild, several of his patients were very kind. They took the time to personally knit baby blankets and gifted him toys and books for the baby. My Dad touched so many lives throughout his career and he was loved by so many.

Arabella A. Buot, herself an ICU nurse (and, one would think, the concomitant extensive experience with physicians) writes:

> Dr. Backos, through his sound judgment and concern for my well being, made sure my pain was managed safely and effectively. Pain doctors walk a thin line when helping their patients. Their judgment is tested at every turn. Pain is subjective and human doctors are not infallible. The question haunts them whether they have given enough to help or not. With the purest of intentions a lapse in judgment could happen.

And from Lou Joseph Safou, who reports that Dr. Backos "prescribed a low dosage of medication, and monitored my prescriptions:"

5

> In my personal opinion after seeing multiple physicians, Dr. Backos cared about the well being of his patients, and what was best for them. He would always put their best interest first. Dr. Backos is very thorough in his interview and examination. When going to every appointment I felt confident in his professional opinion, and that the treatments he prescribed for me were always in my best interest. Dr. Backos is one of the kindest physicians I have ever met and could never be replaced.

Similarly, Debbie Judkins recalls his caring and conservative treatment:

> Based on his advice, I consulted a surgeon and I have had two surgeries on my neck. After my surgeries, I was not pain free but they helped a lot. After the surgeries, Dr. Backos reduced the amount of pain medication, I was taking. Dr, Backus did All could to HELP ME I feel Very Blessed to have met such a dedicated and concerned Doctor and it is hard to express in words my gratitude to him. I am so glad I met him.

Her husband, Randy Judkins, echoes those sentiments as well:

> He always told me if I had any issues with ANYTHING to contact him Right away. He told me about all of risks associated with the medications and the injections, and left the treatment decisions up to me. The injections and the medications gave me great relief from my pain. I don't know what I would have done without his help!!
>
> I have total trust in Dr. Backos. I could talk to him about anything. I wish he was still practicing. He was totally dedicated to making me better. His only concern was to relief from pain.

That Dr. Backos helped patients escape or avoid the pitfalls of opioids is borne out by the letters of James and Richard Perrin. From James:

> I am currently a 75 year old male with many spine surgeries. I was treated for pain management with opiates for 12 years before finding Dr. Backos and the miracle drug Suboxone.

6

> I was a patient of Dr. Backos from 2014 to approximately 20017 for opioid addiction and pain management. He treated me with dignity and respect and exhibited a genuine concern for my health. I was treated with medication and counseling. I was not prescribed opiates during this entire time I was seeing Dr. Backos.

And from Richard, who states that he was addicted to the pain killers for years" before he met Dr. Backos:

> Dr. Backus helped me get off the Vicodin & prescribed me Suboxone, ordered tests (like x-rays & MRIs for my back), & gave me epidural injections in my back. He started me on 3 films of Suboxone a day, then 2 films a day, & now I'm down to 1½ films a day. Dr. Backus listened to me & helped me. He counseled me opioid abuse. He didn't just give me opioids & send me home.

Robert M. Benkovich, who recalls that Dr. Backos "always did everything he could to help me" and "also helped my wife to find several Specialist Doctors in her time of need which was a blessing" recalls: "I found him to be a caring generous man in that regard he always took he time to listen and offer any help he could and treated like a person not just another patient."

In short, Robert B. Nicen describes him as "kind loving and very caring."

These patient experiences are echoed by the submission from Dr. Carl Christensen, with whom Dr. Backos would consult regarding the management of his chronic pain patients: "I found him to be diligent in monitoring his pain patients and receptive to suggestions regarding techniques to monitor them for safety."

7

The same kind of devotion to the well-being of others has been the keystone of his family and personal life.

His wife, Alcesa Abelgas Backos, whom he met when they were medical school classmates in the Philippines, looks back on their years together as follows:

> Our lasting marriage of 42 years speaks for itself. We journeyed together through all the rigorous years of medical school, residency training, studying for and passing all our licensure and board certification exams including - as foreign medical school graduates (FMGs)- the challenging Michigan licensing boards, our specialty and subspecialty board certifications and maintenance of certification exams, in Dr Eric N Backos's case his 3 separate major board certifications in PM&R, Addiction Medicine and Pain Medicine--with all their attendant sacrifices literally drawing "blood, sweat and tears." The practice of medicine is a non-stop life of day to day sacrifices and caring for people who trust you with their life, the care of their loved ones, and who need care at their most vulnerable. It requires diligence, discipline, good judgment, commitment to lifetime continuing medical education, honesty, humility and compassion. We took a sacred Oath.
>
> There was a reason I married Dr. Eric N Backos and ended up still here with him through all these years. As a young medical student away from home in a third world country in the '70s, Dr. Eric N Backos, when I met him was a simple, humble, shy, very bright, diligent, hard working, dedicated and compassionate man. He relentlessly "burned the midnight candles" throughout 4 years of med school. Despite the initial language barrier he excelled among the top of our medical school class. He indeed served Filipino people including the ve ry poor in the rural areas of the Philippines and was very well accepted, respected and loved.

His devotion to family is well illustrated by the recollections of his son, Nick Backos, and his niece Rebecca Hunter. His son writes:

> My dad is not perfect. He is human, his faults are many. But, as a father, he has never once waivered. As a father, he is, in my view, perfect. His love for me and my sister is visceral, and I am uniquely fortunate to have experienced *knowing* that my dad loves me, every day, for all thirty-six years of my life. Throughout my childhood, he of course provided for us; but, more importantly, he was always present. He never missed a 5:00 AM hockey game, lacrosse game, soccer game, piano recital, violin recital. He was born to be a father. The consistent presence being a father entails simply came naturally to him; a byproduct of his immeasurable love. He was a busy guy, probably working eighty-hour weeks. But, somehow, I never looked up and wondered where my dad was. Somehow, every time I looked for him, he was always right there.

His niece describes the support Dr. Backos provided when her father suffered a massive stroke:

> In 2012, my father suffered a massive stroke. My Uncle Eric received the call shortly after 9:00pm: At 9:30pm, my uncle arrived at the Emergency room, to sit with my two sisters and I. During that lime he provided us with every kind of support that we needed. This was by far the worst day of my entire life. I couldn't imagine going through that without the support from my uncle Eric. He was there to answer all questions, gather as much information as he could for us. He also made sure we. were taking breaks to sleep and eat. His goal was not only to make sure that my dad received the best care, but also that my sisters and I didn't go through that alone. My father was in the ICU unresponsive for 15 days. My Uncle Eric was at the hospital every single day for hours, seeing if he could do anything for his family. After my father passed away, my Uncle Eric has been a second dad to me. Anytime I need guidance, his opinion is the one I value most. He is a good man with a kind heart.

As the letter from his cousin Sam Backos illustrates, Dr. Backos is deeply remorseful for the conduct which has brought him before the Court: "I know he has

9

expressed great regret to me for his decisions and actions," a statement which is echoed by his niece Rebecca's husband, Bruce Hunter, who also speaks of the "generosity" he has observed:

> I have spoken with Eric on a couple occasions regarding this matter. Eric has expressed to me how much he regrets his involvement in this matter. He has also stated that when he realized he had prescribed excessive amounts of medication to a few patients, he made adjustments to correct the Issue. This change was made well before the investigation had begun. I think that and the fact that he has owned up to his mistakes speaks volumes and shows his level of integrity and care for his patients.

To be sure, Dr. Backos's history has not been unmarred - most notably by his cocaine addiction. But even here, as the letter from Josh Beauvais, who met him at a Narcotics Anonymous meeting some seven years ago, attests, he has demonstrated a sincere resolve to meet things head on, with honesty and a resolve to do better:

> I admire Eric's recovery, in that when navigating life's ups and downs and successes and failures, he always came to the recovery meeting, completely honest, and confided in people around the tables about his struggles. From there, the mending, healing and growth processes can begin. Through Eric's honesty and example, of how to bounce back from struggles, he has inspired my recovery.

His son Nick describes how his father turned his addiction into something positive by becoming board certified in addiction medicine and using his experience to treat others suffering from addiction:

> He became board certified in addiction medicine, and devoted much of his practice to treating patients struggling with addiction, in addition to

10

his chronic-pain management practice. He has admitted that in 2013 and 2014, while at the Bothra clinic, he improperly prescribed controlled substances. In 2014, he stopped improperly prescribing controlled substances and rebuffed Dr. Bothra's requests to continue to improperly prescribe controlled substances. I believe that for the vast majority of his multi-decade long practice, he acted in complete good faith. He sought to treat people's legitimate ailments, while also doing his best to identify those struggling with addiction and, as evidenced by the 500 patients he discharged for drug diversion or the countless others for whom he was integral in getting into treatment. . .

Dr. Backos will soon be 71 years old, and not in the best of health, as ¶¶ 59-63 of the Presentence Investigation Report reflect. These include:

Esophageal Dysphagia (the sensation of food sticking or getting caught in the base of your throat or in your chest after you have started to swallow), Esophageal Achalasia (a rare disorder that makes it difficult for food and liquid to pass from the swallowing tube connecting your mouth and esophagus to your stomach), Hiatal Hernia (a hole in the diaphragm through which food and liquids pass from the esophagus into the stomach enlarges), Hypothyroidism (thyroid does not create and release enough thyroid hormone into your bloodstream), and gout (sudden, severe attacks of pain, swelling, redness and tenderness in one or more joints).

*Id.,* at ¶ 61.

In addition, he has significant health problems - including a joint tear, bone marrow edema, and osteoarthritis - with both knees, which cause him significant pain and require him to use a cane or, at times, seated rolling walker for assistance. *Id.,* at ¶ 62.

All of these conditions, of course, would make any period of incarceration far more burdensome than would be the case for a person not so afflicted.

In all, then, the matrix of circumstances embraced by Dr. Backos's history and circumstances - including, of course, the conduct which has brought him here - suggest the appropriateness of a noncustodial sentence.

As to the other traditional purposes of punishment, counsel submits that the analysis leads to the same conclusion.

**Deterrence - general and special.**

As for general deterrence - the need to fashion a punishment which will deter the public at large - and, specifically, other physicians - from taking the same course of action as did the defendant, it is to be noted that Dr. Backos has, as a result of his actions, lost his ability to pursue the calling that has heretofore defined his life and livelihood. The writer would suggest that a person - or a physician in particular - would embark on a course of wrongful conduct because he or she might suffer "only" such consequences. As to special deterrence, Dr. Backos, at age 71, has lost his medical licensure, and it is unlikely that he will ever practice again. Beyond this, there is nothing to suggest that, having gone through the experience he has, Dr. Backos would again embark on a course of criminal misadventure. Indeed, the proof is in the pudding. As noted above, Dr. Backos's involvement in the conspiracy

12

terminated in 2014 despite his continued employment at the Bothra clinic and Dr. Bothra pressuring Dr. Backos to continue prescribing unnecessary opioids to patient.

**Incapacitation**.

"The rationale for incapacitation is to allow society to 'protect itself from persons deemed dangerous because of their past criminal history.'" *Allen v. Woodford,* 395 F.3d 979, 1009 (9th Cir. 2004) (citing 1 W. LaFave & A. Scott, Substantive Criminal Law 38 § 1.5 (2003)). For reasons such as those noted immediately above, counsel submit that there is no reason to believe that Dr. Backos poses any continuing danger to the public.

**Rehabilitation.**

It does not appear that rehabilitative considerations should have an impact on the determination of Dr. Backos's sentence. Moreover, his willingness to cooperate is also a sign that Ms. Egan is well on her way to being rehabilitated. As recognized by Judge Motley, in *United States v. Mendola*, 807 F.Supp. 1063, 1067-168 (S.D. N. Y. 1992), "cooperation with the Government...signals a step forward in rehabilitation."

**The kinds of sentences available.**

In the wake of *United States v. Booker,* 543 U.S. 220 (2005), the Court is free to impose any kind of sentence which it deems appropriate.

13

**The need to avoid unwarranted sentencing disparity**.

While it is true that the "unwarranted disparity" reference in "[s]ubsection 3553(a)(6) is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct," it is also true that disparity in sentences between co-defendants is " a factor which [is] fully within the district court's discretion to consider. *United States v. Presley,* 547 F.3d 635, 631-632 (6th Cir. 2008). Here, both factors counsel leniency.

It has long been recognized that the use of noncustodial sentencing options is at its highest in cases involving defendants in Dr. Backos's age cohort. *See, e.g.,* A. N. Blowers & J. K. Doerner, Sentencing outcomes of the Older Prison Population: An Exploration of the Age Leniency Argument, 38 Journal of Crime and Justice 58 (2013); abstract viewed at https://www.tandfonline.com/doi/full/10.1080/0735648X.2013.822161?scroll=top&needAccess=true, as viewed November 28, 2023.

As to the sentences imposed in this case, the only other defendant to have been convicted (also by plea) was Dr. Ronald Kufner, received a sentence of 1 day with credit for time served without imposing a period of supervised release. And although the Presentence Investigation Report ranks Dr. Backos's culpability higher than Dr. Kufner, if this Court imposes a probationary sentence that the Court deems appropriate, Dr. Backos's sentence will be more severe than Dr. Kufner's because he

14

will be monitored by the United States Probation Department for a period of time, this Court deems appropriate. Counsel recognizes that a period of probation is qualitatively different from a custodial sentence. Nevertheless, as stated by the United States Supreme Court in *Gall*, probation is, nevertheless, a substantial restriction on one's liberty:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See *United States v. Knights*, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " (quoting Griffin v. Wisconsin, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); internal quotation marks omitted)). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. U.S.S.G. § 5B1.3.

*Id* at 48.

**The need for restitution.**

Restitution is not an issue in this case although it should be noted, Dr. Backos has agreed to forfeit $500,000.

Dr. Backos has lived a long and worthy, if at times imperfect, life, which has been forever changed by the misconduct to which he has admitted, and for which he

15

is deeply remorseful. In recognition of the pluses in that life, and after putting the minuses into proper perspective, and in keeping with that statutorily mandated considerations, as discussed above, the Court should impose a noncustodial sentence, with appropriate conditions.

                                            Respectfully Submitted,

                                            s/Mark J. Kriger
                                            LaRene & Kriger, P.L.C.
                                            Attorney for Dr. Eric Backos
                                            1717 Penobscot Building
                                            645 Griswold
                                            Detroit, Michigan 48226
                                            (313) 967-0100

DATED: January 24, 2024

CERTIFICATE OF SERVICE

I hereby certify that on   I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.

                                          s/Mark J. Kriger
                                          LaRene & Kriger, P.L.C.
                                          1717 Penobscot Building
                                          645 Griswold
                                          Detroit, Michigan 48226
                                          (313) 967-0100
                                          E-mail: mkriger@sbcglobal.net
                                          Michigan Bar No. 30298